IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 16, 2016 Session

**IN RE MICHAEL B.**

**Appeal from the Chancery Court for Humphreys County**
**No. 2014CV18      Suzanne Lockert-Mash, Judge**

———————————————————

**No. M2015-02497-COA-R3-PT – Filed October 6, 2016**

———————————————————

This is a termination of parental rights case. Father and Stepmother filed a petition to terminate the parental rights of Mother to the child. The trial court found that the grounds of abandonment for willful failure to visit, willful failure to support, and conduct demonstrating a wanton disregard for the welfare of the child had been proven by clear and convincing evidence. The trial court also found that termination was in the best interest of the child. Mother appeals. We reverse the finding of abandonment for willful failure to support but affirm the other grounds for termination and the finding that termination is in the best interest of the child. The termination of Mother's parental rights to the child is therefore affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part; Affirmed in Part**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Donald Capparella and Elizabeth Sitgreaves, Nashville, Tennessee, for the appellant, Kaygen. B.

B. Kyle Sanders, Dickson, Tennessee, for the appellees, Jonathan B. and Alex B.

**OPINION**

**BACKGROUND**

Michael B. ("child") was born in March 2007, to [Mother]/Appellant Kaygen B. ("Mother") and Petitioner/Appellee Jonathan B. ("Father").[1] Mother and Father were unmarried and teenagers at the time of the birth, but married thereafter. The record indicates that Father enlisted in the army prior to the child's birth.[2] Father was home for a period of time immediately before and after the child's birth and lived with Mother and the child in an apartment. However, Father returned to active duty within nine months to a year after the child's birth. When Father returned to active duty, he was stationed in Germany from approximately 2008 until 2010. Mother and the child subsequently moved in with the child's maternal grandmother ("Grandmother").

Mother and Father divorced on July 2, 2009, in the Dickson County Chancery Court while Father was deployed. Mother was designated the child's primary residential parent. Father was ordered to pay $475.00 monthly in child support, which, according to Father, was taken directly out of his military pay. Following his return to the United States, Father began exercising visitation. Mother continued to be the designated primary residential parent although the child was increasingly spending more time with Father.

In October of 2010, Mother's stepfather ("Grandfather"), with whom Mother had an extremely close relationship, died suddenly. Mother became suicidal after Grandfather's death. As a result, Mother was prescribed Lortab, an opiate, and she became increasingly addicted to these pills. By this time, the child was spending more time in Father's care than with Mother. Mother was living a nomadic lifestyle, going from home to home and hotel to hotel. Mother eventually started using heroin. It is undisputed that at some point, Mother began engaging in prostitution to support her drug addiction. In 2011, Mother began using an online website to solicit customers for her prostitution business.

On December 9, 2010, Mother filed a motion for contempt against Father for his failure to pay child support. This issue was resolved, however, on May 31, 2012, when Mother and Father entered into an Agreed Permanent Parenting Plan designating Father as the primary residential parent. The Permanent Parenting Plan ("PPP") contained a specific agreement between the parties that "neither parent shall pay to the other any child support, and both parties hereby acknowledge that there is no child support arrearages owed to either party as of the date of the signing of this plan." Though Mother was not ordered to pay child support, she was ordered to be equally responsible with Father for the child's school and extracurricular activities and maintain health and dental insurance along with Father. Medical expenses not covered by insurance would be paid pro rata by each party, with a provision requiring that the custodial parent send a bill to the other parent within ten days. Neither party disputed the fact that Father never asked Mother for any medical expense reimbursements.

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.
[2] We are unsure if this is accurate because Father would have been a minor at the time.

Although Mother was awarded visitation every weekend, Mother saw the child only sporadically on weekends from August 2011 through September 2012 whenever the child visited Grandmother's house with Father's permission. During this period, Grandmother and Father were in frequent communication to discuss Mother's addiction.

In August 2012, Father and Alex B. ("Stepmother," or, together with Father, "Appellees") married. On September 20, 2012, Father filed for and received a temporary restraining order against Mother. The temporary restraining order issued against Mother stated the following:

> You are hereby RESTRAINED AND ENJOINED from interfering with Petitioner, [Father's], possession of the minor child . . . . You . . . shall not, in any way, attempt to remove the child from [Father] or those to whom he entrusts the care of the minor child.

Mother entered a twenty-eight day rehabilitation program for opiate and heroin addiction at The Ranch, in Nunnelly, Tennessee, on September 26, 2012. Upon her release, Mother was prescribed anti-psychotic drugs. Subsequent to her stay at The Ranch, Mother attended one mental health class. It was undisputed that Mother relapsed three days after ending treatment at The Ranch. After her release from treatment, Mother lived with Grandmother for several months.

On December 14, 2012, Mother filed a motion for holiday visitation with the child, but the motion was never set for a hearing. On January 10, 2013, the parties entered into an agreed order extending the temporary restraining order. Mother's drug use continued unabated at this time.

In March 2013, Mother saw the child at a birthday party that Grandmother had organized at a local restaurant. In June 2013, Grandmother planned a zoo trip with the child and picked Mother up from a hotel where she was staying with her pimp.[3] Grandmother, Mother, and the child went to the zoo, and Mother returned to her hotel after the trip while the child returned to Grandmother's house. After this visit, Mother requested permission from Father that she be able to call the child every night after the zoo trip. Father obliged; however Mother called twice, stopped calling for a day or two, and called once more before she ceased contact.

---

[3] A "pimp" is "a man who manages, and, often, controls a prostitute or prostitutes and their earnings." *Webster's New World College Dictionary* 1107 (5th ed. 2014). According to Mother, her pimp was also her boyfriend.

In August 2013, Mother was arrested and ultimately pled guilty to facilitation of aggravated robbery in Robertson County. Allegedly, there was a misunderstanding between Mother and a john[4] in connection with the terms of payment for Mother's services. When the exchange escalated, Mother's pimp hit the john in the head with a gun, and took his wallet and cell phone. Mother spent three months in jail, from August 20, 2013, to November 27, 2013, and then served the remainder of her term on Community Corrections.

On January 31, 2014, Appellees filed a petition in the Humphreys County Chancery Court ("the trial court") to terminate the parental rights of Mother to the child.[5] The original petition was amended twice, with the last amended petition being filed on March 28, 2014. The second amended petition alleged as grounds: (1) willful failure to visit, (2) willful failure to support, (3) wanton disregard, and (4) persistence of conditions.

After the filing of the petition, the parties agreed to a telephone schedule, the terms of which allowed Mother to call the child every Sunday and Wednesday. Mother not only failed to call the first day but also only called "a handful" of times before she again ceased contact with the child.

In April 2014, Mother again started using Lortab which eventually led her back to heroin. Mother began to prostitute again "[e]veryday." Mother violated Community Corrections in June 2014 when she tested positive for cocaine, opiates, and marijuana; as a result, Mother was allowed to attend another inpatient rehabilitation program at the Hope Center. Mother successfully completed the program on July 12, 2015. As of the date of trial, Mother had been out of the Hope Center for about two months and had been drug-free for approximately fourteen months.

On October 2, 2014, Appellees filed a motion for an emergency no contact order, and, after a telephonic hearing on the same day, the trial court entered a no contact order on October 13, 2014, which was later extended on June 15, 2015. The final hearing on the termination petition was held on August 25, 2015, and August 31, 2015.

Father first testified about the circumstances wherein he was named the child's primary residential parent. According to Father, when he came home from deployment in May of 2010, he began to see the child on a more frequent basis. Father alleged that Mother's inability to care for the child due to illness and other issues resulted in the child spending most of his time with Father. According to Father, around the fall of 2011, Mother "pretty well gave [the child] to me[.]" Father described Mother's contact with the child as "sporadic" during this period. Father testified that even though Mother was

---

[4] A "john" is "a customer of a prostitute." *Webster's New World College Dictionary* 783 (5th ed. 2014).

[5] In the same petition, Appellees also requested permission for Stepmother to adopt the child.

4

allowed visitation, Mother did not exercise her visitation regularly; according to Father, Mother would often either fail to pick the child up or bring him home early.

Father testified that he requested the September 2012 temporary restraining order out of a concern that Mother would take the child to an unsafe environment, such as to the hotels where she was staying. Father indicated that this fear stemmed from Mother's issues with drug abuse and inconsistent living quarters. According to Father, he learned of Mother's prostitution and drug addiction from Grandmother. Father testified that the temporary restraining order would have been dissolved if Mother had provided a clean drug screen. Father maintained that Mother only saw the child once during the relevant four-month period—the June 2013 zoo trip. After each contact with Mother, Father testified that the child would become more defiant and more disruptive in school. When Mother ceased contact, Father testified that the child eventually returned to his normal routine. According to Father, the child was doing well in school and has not had any behavioral problems since Mother has been out of his life. Father denied ever preventing Mother from calling or seeing the child.

Father explained that the child bonded with Stepmother, his two half-siblings who live in the home, and Stepmother's side of the family. Stepmother generally corroborated Father's testimony regarding Mother's inconsistent and sporadic contact with the child. Stepmother testified that the child's "little world just flipped upside down" whenever Mother entered and left his life. Stepmother also generally denied that Father ever made it difficult for Mother to visit with the child. Stepmother testified that in 2013, Mother only saw the child during his birthday party at Grandmother's house in March and on a zoo trip in June. According to Stepmother, Appellees allowed the child to visit with Grandmother during those times because Grandmother had requested it, and that Mother just showed up when the child happened to be at Grandmother's house. After the zoo trip, Stepmother testified that Mother requested to be able to call the child every night to tell him good night but that Mother was not consistent in her efforts. Stepmother testified that the child refused to go to bed until Mother called and that Appellees had to make up reasons to explain Mother's lack of commitment. During this time, Stepmother alleged that Mother was regularly updating her social media account.

Doctor Janie Berryman, a licensed psychologist hired by Appellees who had seen the child six times, testified that she was initially asked to determine whether it was in the child's best interests to interact with Mother regarding the extension of the no contact order. Dr. Berryman had access to the child's school records, transcripts from teachers, DCS records, a police report, and some Vanderbilt psychological evaluation and medical records. Dr. Berryman testified that, with the child's ADHD diagnosis, the child needs structure, predictability, and consistency. When asked her opinion as to the effect of a parent re-entering the child's life only to disappear again, Dr. Berryman testified that disruption and anger would recur. According to Dr. Berryman, the child saw Mother's arrest on the news while he was at Grandmother's house and understood that Mother

5

"had to go to jail because she robbed somebody." Dr. Berryman testified that the child is very affectionate with Appellees, is very fond of them, and was "positive" whenever he spoke about Stepmother. Dr. Berryman only talked to Mother once in February 2015 just to get "information that [she] needed." As to the child's mental health status, Dr. Berryman testified that the child "seems happy-go-lucky" and "to be stable and well[-]adjusted at the moment." If this routine and schedule were disrupted, Dr. Berryman suggested that some deterioration in terms of the child's mood and behavior would occur. When asked how long of a stable period it would take from Mother before the process of reunification with the child could begin, Dr. Berryman testified that Mother would need to stay sober for at least six months after completion of rehabilitation treatment, in combination with other factors such as following through with an after-care program, retaining a job, having a place to live, developing relationships, and staying away from bad influences.

Mother generally agreed that she had been a sporadic presence in the child's life. Mother testified that she had been diagnosed with ADHD, insomnia, bipolar disorder, and post-traumatic stress disorder. Mother admitted, however, that she is not medicated for those disorders, nor had she sought any psychiatric help or counseling since she was released from rehab, despite promises to do so. Mother agreed that the child started living with Father "[b]asically immediately after [Grandfather] died." Though Mother initially testified that she started abusing drugs after Grandfather's death, later on in her testimony, she attributed her addiction to pain medicine prescribed to her following a 2011 surgery for endometriosis. Mother ascribed her nomadic lifestyle of living from hotel to hotel and house to house to being kicked out of Grandmother's house for suspected drug abuse. Mother testified that she began using heroin prior to entering rehab at The Ranch in September 2012. Besides her August 2013 arrest and 2014 Community Correction violation, Mother admitted to other criminal charges, including: (1) a 2011 assault charge in Williamson County; (2) a 2011 misdemeanor theft charge in Cheatham County;[6] (3) and a 2013 solicitation of prostitution charge in Davidson County.

Mother contested Father's recollection of her visitation with the child during the relevant four-month period. In addition to the child's birthday party in March 2013 and the zoo trip in June 2013, Mother alleged that she saw the child around her birthday in May of 2013. Mother testified that she experienced withdrawal symptoms at the child's birthday party because she did not have enough money to buy drugs; she also recalled that she asked Grandmother for money on this occasion. Mother also denied that she ever exposed the child to her lifestyle; she explained that the only time the child stayed overnight with her at a hotel was when Grandmother rented a suite so that Mother and the child could spend time together. However, Mother could not recall when that event took

---

[6] Mother was arrested for failing to appear at her August 2012 court date for this charge.

place.[7]    Mother testified that on December 7, 2013, she sent a Facebook message to Father requesting a visitation schedule with the child.[8]    Mother admitted when questioned by the trial court that she never called to request visitation with the child nor requested that Grandmother set up a meeting with the child after her release in November of 2013 aside from the alleged Facebook message.

Mother testified that her prior boyfriend had been her pimp from March 2013 up until the date of her arrest in August 2013.  Mother alleged that the pimp used her addiction to control her and that she stayed with him out of necessity.  Mother admitted that she asked Grandmother to send the child gifts during holidays but did not herself purchase or mail presents to the child. Mother admitted that in addition to prostitution, she worked at a car lot briefly sometime between September 2012 and June 2014.

Mother testified that she abandoned her previously-made plans of interning with the Hope Center after her release because of the changes in the center's leadership. Rather, Mother's weekly schedule as of the date of the final hearing consisted of: (1) meeting with her probation officer and attending her Narcotics Anonymous class on Monday nights and (2) attending church services on Wednesday nights and on Sundays. In addition, Mother testified that she was spending more time with her family.  Mother asserted that she was asked to share her testimony with others who were struggling with addiction.  Mother also attempted to introduce letters addressed to the trial court on her behalf from individuals such as her probation officer and family members in support of Mother's progress in her recovery, but the trial court denied their admission into evidence.

With regard to Mother's visitation during the four months preceding the filing of the termination petition, Grandmother corroborated Mother's testimony that Mother saw the child around May of 2013 in addition to the June 2013 zoo visit.  According to Grandmother, in May 2013, "[Mother] came to my house to get her birthday present and visited with [the child]" but generally could not remember specific details.  At some point after the filing of the petition, Grandmother alleged that she and her side of the family were no longer allowed to contact the child.

As to Mother's current condition, Grandmother testified that Mother works for her as her personal assistant flipping homes and that she entrusted Mother with certain

---

[7] Mother was generally unsure of when events took place throughout her testimony and oftentimes would get dates confused.

[8] Counsel for Appellees objected to the admission of a computer printout into evidence because the face of the printout gave no indication that it came from Facebook. Appellees' counsel also asserted that Mother did not include this in her discovery materials.  After much dispute about the authenticity and reliability of the printout and the fact that Mother did not disclose this evidence during discovery, the trial judge allowed the printout to be admitted into evidence.

responsibilities, such as hiring contractors, ordering materials, and gathering foreclosure information. Grandmother testified that she was willing and able to help support Mother if Mother were allowed to be reintegrated into the child's life.

Following the two-day hearing, the trial court took the case under advisement. On October 15, 2015, the trial court issued a Memorandum Opinion. Thereafter, on November 12, 2015, the trial court entered a written order containing detailed findings of fact and conclusions of law. The order granted Appellees' petition for termination of Mother's parental rights on the grounds of (1) abandonment by willful failure to visit the child for a period of four consecutive months prior to Mother's incarceration, (2) abandonment by failure to support or make reasonable payments toward the child's support for a period of four consecutive months prior to Mother's incarceration, and (3) abandonment based on wanton disregard for the welfare of the child.[9] The trial court also found it was in the child's best interest to terminate Mother's parental rights. Mother filed a timely notice of appeal.

## ISSUES

Mother raises two issues, which are taken from her brief and slightly restated:

1. Whether the trial court erred in determining that there was clear and convincing evidence to support termination of Mother's parental rights on the grounds of abandonment by willful failure to support, by willful failure to visit for the four months preceding her incarceration, and wanton disregard for the welfare of the child.[10]

---

[9] The trial court found no ground for termination based on persistence of conditions because Father and Stepmother failed to show that the child had been removed from Mother's home by court order. Appellees do not appeal the trial court's finding on this ground.

[10] Mother did not designate the trial court's finding regarding wanton disregard as an issue in the statement of the issues section of her appellate brief. However, Mother does raise the trial court's finding as to this ground as an error in the argument section of her brief. Generally, "an issue may be deemed waived when it is argued in the brief but is not designated as an issue in [a statement of the issues presented for review]." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). Regardless, in the context of parental termination cases, the Tennessee Supreme Court has directed this Court to consider every ground for termination found by the trial court, even if not specifically appealed by the parent. *See In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016), petition for writ of cert. docketed (April 27, 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."). Accordingly, we will also consider the evidence with regard to abandonment based on wanton disregard for the child's welfare as to Mother.

2. Whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the child.

## STANDARD OF REVIEW

As recently explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn.

Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

As recently opined by the Tennessee Supreme Court:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*Carrington H.*, 2016 WL 819593, at *12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

### DISCUSSION

### Grounds for Termination

Pursuant to Tennessee Code Annotated Section 36-1-113(g)(1), "[a]bandonment by the parent or guardian, as defined in § 36-1-102" constitutes a ground for termination of a parent's parental rights. Tennessee Code Annotated Section 36-1-102, in turn, provides several definitions for abandonment. In this case, Appellees alleged, and the trial court found, the following types of abandonment against Mother: abandonment by an incarcerated parent for failure to visit, abandonment by an incarcerated parent for failure to support, and abandonment by an incarcerated parent for wanton disregard under Tennessee Code Annotated Section 36-1-102(a)(iv). Section 36-1-102(a)(iv) provides:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the

10

child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

As an initial matter, we must first determine whether the grounds applied by the trial court are applicable to Mother. The statute "begins by describing the class of people to whom the statute applies." *In re Audrey S.*, 182 S.W.3d 838, 870 (Tenn. Ct. App. 2005). As is evident from the language of the statute, the grounds under Section 102(1)(A)(iv) applies only where "the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of [a parental termination] proceeding." In this case, the trial court made the following specific findings concerning the ground of abandonment by willful failure to visit:

> The Petition to Terminate Parental Rights was filed . . . on [January 31, 2014]. The [trial c]ourt must look to the four months preceding this date. During this four month time period, [Mother] was incarcerated in the Robertson County Jail having been arrested on August 20, 2013 and remaining incarcerated until [November 27, 2013].

Because Mother was incarcerated within the four months preceding the filing of the termination petition, the trial court correctly concluded that the abandonment definitions contained in Section 102(1)(A)(iv) were applicable. *See In re Keith W.*, No. W2016-00072-COA-R3-PT, 2016 WL 4147011, at *6 (Tenn. Ct. App. Aug. 3, 2016) (holding that the incarcerated parent definitions for abandonment did not apply because the father was not incarcerated at or in the four months preceding the filing of the termination petition); *see In re Navada N.*, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at *14 (Tenn. Ct. App. May 23, 2016) (describing incarceration within the four months preceding the filing of the termination petition as a "condition precedent" to the application of the abandonment definitions under Section 102(1)(A)(iv)). We will therefore proceed to consider the evidence presented regarding each ground.

### *Willful Failure to Visit for the Four Months Preceding Incarceration*

We begin with abandonment by willful failure to visit. With respect to this ground, abandonment may be proven by establishing "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Tennessee Code Annotated Section 36-1-102 further provides that "token visitation" means that "the visitation . . . constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann.

11

§ 36-1-102(1)(C). As is evident from the above language, the statutory definition of abandonment for willful failure to visit under Section 102(1)(A)(iv) requires us to focus on the period of "four (4) consecutive months immediately preceding [the] parent's . . . incarceration." Thus, the relevant time frame that we must be concerned with is the period of time between April 20, 2013, and August 19, 2013, the date just prior to Mother's incarceration.

In order for a court to terminate a parent's parental rights on the ground of abandonment by willful failure to visit, the parent's failure to visit must be willful. In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing . . . .
>
> *   *   *
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 72 Ark. App. 71, 32 S.W.3d 758, 760 (2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 393 Pa. Super. 355, 574 A.2d 649, 652 (1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982). . . .
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 863–64 (internal citations and footnotes omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a

parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law de novo with no presumption of correctness. *Id.*

The trial court made the following detailed findings of fact on this issue:

> [Mother] visited with the child in March 2013 when the child's grandmother invited her to a birthday party, and again [Mother] visited with the minor child in June of 2013, at the request of the grandmother. These were the only two visits during the relevant four-month period of time. The Court finds that the visitation that occurred during this time was, at best, token visitation as outlined by Tennessee Code Annotated Section 36-1-102 (1)(E). The Court further finds that but for the father allowing the maternal grandmother visitation and the grandmother arranging to meet with her daughter, [Mother] would not have seen the minor child at all. The Court also finds that [Mother] possessed a cell phone that she would use check backpage.com and to arrange meetings with men as part of her prostitution business. [Mother] also testified that she would call her mother occasionally "just to let her know I wasn't dead." [Mother] admitted that she did not maintain telephone contact with the child even when she was given a number and a schedule of when she could call. [Mother] also testified, and the Court does find that [Father] did nothing to prevent [Mother] from seeing the minor child before entering the Hope Center. The Court finds by clear and convincing evidence that [Mother] willfully failed to visit the minor child during the four-month period preceding her incarceration.

The record does not preponderate against the trial court's finding that Mother exercised visitation only twice in the months leading up to the filing of the termination petition. Here, it is undisputed that Mother saw the child in June 2013 at the zoo, within the relevant four-month period. It was also undisputed that Mother visited with the child on his birthday in March 2013. The March 2013 visit, however, did not occur within the relevant four-month period. Thus, it appears from the record that Mother exercised visitation with the child only a single time in the relevant four-month period.[11] We have

---

[11] Although not mentioned in Mother's appellate brief, at trial, both Mother and Grandmother contended that there was at least one other time during the applicable four-month period in which Mother saw the child, but Father and Stepmother denied any knowledge of this visitation. As discussed above, the trial court specifically found that the only two visits in 2013 were the March 2013 birthday visit and the June 2013 zoo trip. The trial court therefore credited the testimony of Father and Stepmother. Where the trial court's factual determinations are based upon its assessment of witness credibility, we will only overturn the trial court's rulings if clear and convincing evidence to the contrary is shown. *Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)). Because Mother did not raise the trial court's failure to consider this visit in her

13

previously held that a single visit in the span of four months constitutes no more than token visitation. *See In re B.P.C.*, No. M2006-02084-COA-R3-PT, 2007 WL 1159199, at *9 (Tenn. Ct. App. Apr. 18, 2007). Accordingly, the evidence does not preponderate against the trial court's finding that Mother's visitation was merely token.

Despite Mother's contention otherwise, the evidence also preponderates in favor of the trial court's finding that Mother's failure to engage in more than token visitation with the child was willful. The trial court specifically found that Mother had the ability to contact Father and arrange meetings, evidenced by her occasional calls to Grandmother, her social media postings, and the maintenance of her prostitution business web page listing. Despite Mother's ability to initiate visitation, the evidence shows that Grandmother initiated all calls to Father concerning visitation and Grandmother picked Mother up from her residence so the child could spend what little time he did with Mother. As such, it appears that Grandmother was the engineer of all in-person visits between Mother and the child. Furthermore, although Mother requested the opportunity to telephone the child, she did not consistently take advantage of that opportunity; the record shows that Mother only called a few times after the June 2013 visit and then stopped of her own volition.

Despite these facts, Mother argues that she lacked the "willfulness" required for the finding that she failed to visit because of the September 2012 restraining order. Mother further argues that she attempted to reach out to Father to exercise visitation and received no response. A parent who attempts to visit and maintains a relationship with the child, but is "thwarted by the acts of others and circumstances beyond [her] control," cannot be found to have willfully abandoned the child. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). This Court has also previously held that an unequivocal no contact order may prevent a finding of willfulness in the context of a parent's failure to visit. *See In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *5 (Tenn. Ct. App. Apr. 25, 2005) (preventing all contact between the father and child). *But see In re Jaylah W.*, 486 S.W.3d 537, 551–52 (Tenn. Ct. App. 2015), *perm. app. denied* (Feb. 1, 2016) ("It is well-settled that a trial court's order requiring that a parent complete some task or meet a condition before resuming visitation does not preclude a finding a willfulness.") (citing *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) (no perm. app filed) ("This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit."); *State Dept. of Children's Servs. v. J.A.H.*, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec.

---

appellate brief and this issue was decided based on credibility, we will not overturn it on appeal. We therefore consider only the June 2013 visit for purposes of whether Mother willfully failed to visit the child prior to her incarceration.

28, 2005) (opining that a parent's decision to refuse to cooperate with certain conditions related to the resumption of visitation constitutes a "willful choice")).

With regard to her contention that Father refused to participate in Mother's attempt to schedule visitation, Mother's contention is simply not supported by the record. We first note that when asked at trial whether Father ever prevented her from seeing the child, Mother answered that he had not. Likewise, during an earlier hearing, Mother admitted on cross-examination that Father had done nothing to stop her from calling the child prior to her entry into rehabilitation in July 2014.

Additionally, the record does not show that the temporary restraining order in any way prevented Mother from exercising visitation with the child. First, we note that although Mother characterized the September 2012 order as requiring "no contact," the order does not actually provide for no contact between Mother and the child. Instead, the order merely requires that Mother not attempt to remove the child from Father's custody. Based upon our reading of the order, Mother was permitted to contact Father to arrange for visitation with the child. Indeed, it appears that each and every time that Mother, or more typically Grandmother, requested contact with the child, Father obliged, despite the fact that the restraining order was in place. The record indicates, however, that Mother voluntarily ceased contact each time that she had the opportunity to visit with or contact the child. Her lack of effort to exercise visitation with the child cannot therefore reasonably be attributed to the temporary restraining order. Thus, we conclude that clear and convincing evidence supports the trial court's finding that Mother willfully failed to visit the child in the relevant time period.

### Abandonment by Willful Failure to Support for the Four Months Preceding Incarceration

Mother next argues that the trial court erred in finding clear and convincing evidence of abandonment by willful failure to support. According to Tennessee Code Annotated Section 36-1-102, abandonment may be shown when a parent has "willfully failed to support or has willfully failed to make reasonable payments toward the support of the child" during the relevant four month period, which, as noted in the previous section, is from April 20, 2013, through August 19, 2013. "A party seeking termination of parental rights must prove by clear and convincing evidence that the opposing party had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641.

In this case, the trial court made the following findings concerning the ground of abandonment by willful failure to support:

> [Mother] willfully failed to provide any type of monetary support toward the needs of [the child] during the four months preceding her

15

incarceration. The [trial court] finds that [Mother] was earning an income, albeit from illegal sources, and that her money was used to purchase illegal drugs. [Mother] testified, and the [trial court] finds that, during this period of time, [Mother] was actively addicted to opiates and [heroin] and was prostituting in order to obtain money to satisfy her drug habit. [Mother] willfully failed to support or make reasonable payments toward the support of the minor child during the relevant four-month period . . . .

Mother argues that although there was evidence she was earning income engaging in illicit behavior, there was no evidence regarding how much she was earning, or whether this would have been sufficient income to allow her provide support for the child. We agree.

Recently, Tennessee courts have held that it is not enough for a party seeking termination to "simply prove that [a parent] was not disabled during the relevant timeframe" and therefore assume that the parent was capable of working and paying child support. *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *9 (Tenn. Ct. App. Mar. 12, 2015) (quoting *In re Josephine E.M.C.*, 2014 WL 1515485 at *18 (Tenn. Ct. App. 2014)). Instead, the Tennessee Supreme Court has indicated that in addition to evidence of the parent's income during the relevant time frame, the party seeking termination must also present evidence on the parent's expenses during that time. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013). Thus, in order to establish the ground of abandonment by willful failure to support by clear and convincing evidence, the party seeking termination must generally "submit . . . evidence regarding [the parent's] employment, income, [or] other non-monetary assets," as well as the parent's "expenses during the four-month period." *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *9 (Tenn. Ct. App. Feb. 24, 2016). For example, this Court in *In re Noah B.B.*, noted that the record contained "no evidence regarding [the parent's] financial means, expenses, or obligations." *In re Noah*, 2015 WL 1186018, at *9. "Without this basic information," the Court was "unable to determine, by clear and convincing evidence, whether [the parent] had the capacity to provide support." *Id.*

The same is true in this case. Here, there was some evidence that Mother was employed as a prostitute at various times throughout the child's life. In addition, Mother, without providing dates, testified as to other jobs she held over the years. No proof was introduced, however, as to Mother's actual or approximate income during the relevant four-month period. Furthermore, the record contains no evidence of Mother's expenses during the relevant time period from which this Court could conclude that Mother had the capacity to pay support. Under these circumstances, Appellees failed to present clear and convincing evidence that Mother failed to pay support despite her capacity to do so.

Furthermore, we are troubled by the fact that an order was entered in Mother's and Father's divorce that specifically excused either party from paying any support for the child. According to the agreement, Mother agreed to forego back child support that Father owed; in exchange, Father released Mother from any future obligation to pay child support. Mother therefore contends that she had a reasonable belief that she was not required to pay support for the child. Thus, Mother argues that the agreed order prevents a finding of "willfulness" because Mother lacked the necessary intent. Although it is well-settled in Tennessee that "the custodial parent may not waive the minor child's right of support," *see, e.g.*, *A.B.C. v. A.H.*, No. E2004-00916-COA-R3-CV, 2005 WL 74106, at *7 (Tenn. Ct. App. Jan. 13, 2005), the existence of this court order clearly calls into question whether Mother's failure to pay child support constitutes abandonment by willful failure to support.

In light of the foregoing, we cannot say that clear and convincing evidence establishes that Mother had the ability to fulfill her child support obligation but willfully failed to do so during the relevant four-month period. Accordingly, we reverse the finding that the ground of abandonment by an incarcerated parent for willful failure to support was proved against Mother.

### *Abandonment by Wanton Disregard for the Welfare of the child*

We next address whether sufficient evidence exists to support the trial court's finding of abandonment by an incarcerated parent based on wanton disregard. With regard to this ground of abandonment, this Court has explained:

> Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*
> Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g.*, *State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App.

17

Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68.

*In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009).

The trial court found that sufficient evidence existed to prove that Mother exhibited a wanton disregard for the child prior to her incarceration:

The [trial c]ourt finds that [Mother] testified that she began using illegal drugs and became involved in criminal activities after the death of [Grandfather] on October 31, 2010. After [Grandfather's] death, [Mother] was hospitalized for depression and was prescribed narcotics. Within four months of this hospitalization, [Mother] began seeking narcotics through illegal sources. [Mother] also admitted to using heroin prior to her incarceration, although the [trial court] finds her testimony regarding her heroin usage to not be consistent. At the final hearing, [Mother] testified that she began using heroin prior to September of 2012. At the October 2014 hearing, she testified that she first saw heroin after her release from jail in November of 2013. [Mother] also admitted that she began to prostitute herself to pay for her drug addiction. The [trial c]ourt finds and [Mother] testified that she began advertising her prostituti[on] services on an internet site known as backpage.com as early as November 29, 2011. On May 31, 2012, a new parenting plan was filed in the Chancery Court for Dickson County establishing Father as the primary residential parent.

Prior to her incarceration, [Mother] was cited for prostitution in Davidson County and shoplifting in Cheatham County. . . .

The trial court also found that, after Mother was released from her most recent incarceration, she "pled guilty to Facilitation of Aggravated Robbery [on February 7, 2014], and was sentenced to three years Community Corrections." Even after her plea and the filing of the petition to terminate parental rights, the trial court found that "[Mother] returned to her nomadic lifestyle," "delved back into the world of drugs and prostitution," and "was arrested on a Violation of Community Corrections warrant [on June 6, 2014]."

18

The ground of wanton disregard need not require that the conduct at issue occur within the four month window prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005) ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."). Examples of wanton disregard might include conduct such as "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child." *In re Audrey S.*, 182 S.W.3d. at 867–68.

"The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). In the present case, Mother admitted that she "wasn't thinking about anybody but [her]self" while she was in "active addiction." Indeed, Mother first became addicted to drugs and sold sex while she still had custody of the child. Mother repeatedly relapsed and engaged in criminal behavior, and this pattern continued even after the petition to terminate parental rights was filed. Like the trial court, we conclude that Mother's conduct prior to her incarceration exhibited a wanton disregard for the child's welfare. Our conclusion is supported by other decisions of this Court which have held that a parent's drug habit and related criminal activity constituted conduct exhibiting a wanton disregard for the parent's children. *See, e.g.*, *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse."); *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005) (quoting *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005)) ("[A]n incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child.").

Mother argues that she was concerned about the child's well-being even though she was struggling with her addiction by making the decision to designate Father as the primary residential parent. However, the trial court specifically found that the "child's welfare was not [Mother's] main concern during this time," and, as discussed earlier, issues of credibility will not be disturbed by this Court absent clear and convincing evidence to the contrary. The evidence clearly demonstrates a wanton disregard of the child. Therefore, we hold that the record contains clear and convincing evidence to support the trial court's finding of conduct demonstrating wanton disregard for the child's welfare.

***Best Interest of the Child***

19

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether

20

there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

The trial court made detailed and thorough findings with regard to its finding that it was in the best interests of the child for Mother's rights to be terminated. First, the trial court found that although Mother had taken steps to overcome her drug addiction, it was not convinced that these steps would lead to a lasting adjustment. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). Here the trial court found that Mother's inability to make a lasting adjustment was evidenced by her failure to consummate the plans she made during the pendency of the termination proceedings. For example, the trial court found that Mother did not stay on as an employee at the rehabilitation program upon her completion of the program, as she had previously informed Father she intended to do only months prior to trial. Furthermore, although Mother promised during the pendency of the proceedings that she would obtain psychological counseling, she likewise failed to obtain any counseling by the time of the termination trial. In addition, as the trial court noted, Mother is dependent on Grandmother for a home and a job.

21

The trial court also found that Mother's contact with the child had been minimal and that Mother did not maintain telephone contact even after she was given the opportunity to do so. *See* Tenn. Code Ann. § 36-1-113(i)(3). The trial court pointed out that Mother testified during her deposition on June 8, 2015, that "[a]t this moment, I do not have a meaningful relationship with my son." This admission, coupled with the fact that Mother had not seen the child in nearly two years, that he no longer inquires about her, and that his behavior and attitude have improved in her absence, all led the trial court to conclude that Mother and the child lack a meaningful relationship. *See* Tenn. Code Ann. § 36-1-113(i)(4). Importantly, the trial court also noted that Mother's sporadic contact with the child has caused psychological, emotional, and behavioral problems for the child. *See* Tenn. Code Ann. § 36-1-113(i)(5). The trial court credited Father's and Dr. Berryman's testimonies that the child needs stability in his life and that contact with Mother would provide set-backs to the child's progress.

In addition, the trial court found that Mother's present aftercare plan includes reporting to Community Corrections, attending church, and attending a Narcotics Anonymous meeting once a week but that Mother was not seeking counseling for the problems that caused her addiction in the first place. *See* Tenn. Code Ann. § 36-1-113(i)(8). The trial court was not confident that Mother could provide a safe and stable environment for the child because of Mother's dependence on Grandmother for a home and a job and her minimal recovery meetings. *See* Tenn. Code Ann. § 36-1-113(i)(7). Though the trial court believed that Grandmother would not knowingly allow criminal activity to take place in her home, it was concerned that Mother was able to hide her heroin addiction and prostitution from Grandmother for many years. The trial court also took into account the fact that Mother failed to provide any monetary support for the child after the child went to live with Father. *See* Tenn. Code Ann. § 36-1-113(i)(9).

Mother generally argues that the record preponderates against the trial court's findings. In particular, Mother argues that the trial court abused its discretion by excluding from evidence letters from various individuals, including Mother's probation officer and other family members to demonstrate her adjustment of circumstances. Mother argues that the letters are admissible pursuant to Tennessee Rules of Evidence 803(21) as a hearsay exception for evidence of character. The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay evidence is not admissible except as provided by [the Tennessee Rules of Evidence] or otherwise by law." Tenn. R. Evid. 802. An exception to the general rule against hearsay is "[r]eputation of a person's character among associates or in the community." Tenn. R. Evid. 803(21). In the instant case, the letters do not detail Mother's reputation in the community but instead discuss her current sobriety, past events, and opinions as to Mother's character. Clearly, the letters contain matters not authorized by Rule 803(21).

22

Even assuming arguendo that the information contained in the letters may have been admissible under Rule 803(21), Mother's argument also fails under the hearsay within hearsay rule as she has set forth no independent basis for avoiding hearsay exclusion as to the letters themselves. "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." Tenn. R. Evid. 805. In other words, it is not sufficient that the **contents** of the letters are admissible as a hearsay exception; the **letters themselves** must also comply with the hearsay rules. The letters themselves are hearsay, as the individuals who purportedly wrote the letters were not present in court and were not subject to cross-examination. "The determination of whether a hearsay statement is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." *Arias v. Duro Standard Prod. Co.*, 303 S.W.3d 256, 262 (Tenn. 2010) (citing *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997)). "We will not reverse the ruling of the trial court absent a showing that this discretion has been abused." *Id.* (citing *Stout*, 46 S.W.3d at 697). Based on the foregoing, we conclude that the trial court did not abuse its discretion in excluding this evidence over Appellees' objection.

Even if we were to consider the contents of the letters as admissible hearsay, the letters themselves do not demonstrate that Mother has made a lasting adjustment in her circumstances in light of the fact that Mother had only been out of an in-patient rehabilitation program for about two months as of the date of the final hearing. *See, e.g.*, *In re M.A.P.*, No. E2014-02413-COA-R3-PT, 2016 WL 369399, at *10 (Tenn. Ct. App. Jan. 29, 2016) (concluding that mother "ha[d] not made 'lasting adjustments'" when mother "obtained employment about one month before trial and new housing about one month after" and "also failed to make progress on her mental health issues"). We hold that the trial court did not abuse its discretion in refusing to admit these letters into evidence over a hearsay objection.

From the totality of the circumstances, we conclude that the evidence in the record does not preponderate against the trial court's findings with regard to the best interest factors contained in Tennessee Code Annotated Section 36-1-113(i). Here, while Mother has made some effort to change her circumstances in the year leading up to trial, her efforts are simply "too little, too late." *See In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. Feb. 27, 2015) (holding that father's efforts after the termination petition was filed were "too little, too late"); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (holding that mother's improvement only a few months prior to trial was "[t]oo little, too late"). Indeed, the record shows that even after the petition was filed, Mother relapsed, continued to engage in prostitution to support her drug habit, and violated her Community Corrections, resulting in her re-incarceration. There was no dispute, however, that Mother was sober at the time of trial and had been for over a year. As of the date of trial, however, Mother had only been out of an in-patient rehabilitation

program for two months, allowing little assurance that Mother will be able to maintain her current sobriety long-term.

In contrast, the record indicates that the child has done well in his Father's and Stepmother's home. Mother had many opportunities during the four-year period to visit with the child and to maintain a relationship with him but she failed to do so voluntarily because she was in "active addiction." Father and Stepmother have a meaningful relationship with the child, but Mother has little to no relationship with him at all. In fact, Mother admitted that she felt Appellees had provided a good home for the child and that the child was "probably devastated" each time she entered and left his life. In addition, Stepmother stated that she wants to adopt the child. The child has been calling Stepmother "Mom," and Stepmother refers to the child as her "baby." Dr. Berryman maintains that the child is doing well in school and thrives due to the stability in his life, which would be undermined by Mother's unpredictable presence. As of the date of the final hearing, however, the child's psychological and behavioral problems had ceased. As such, clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the child's best interest.

## CONCLUSION

The judgment of the Humphreys County Chancery Court is reversed in part and affirmed in part. The trial court's ruling terminating Mother's parental rights is affirmed. Costs of this appeal are taxed to Appellant, Kaygen B., and her surety, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE